**BERKELEY BANK FOR COOPERA-
TIVES, Plaintiff and Appellant,**

v.

**Gary A. MEIBOS, dba Meibos Bros.,
etc., Defendant and Respondent.**

No. 15824.

Supreme Court of Utah.

Jan. 17, 1980.

John H. Allen and Janeen J. Aggen of Callister, Greene & Nebeker, Salt Lake City, for plaintiff and appellant.

Harold A. Hintze and Walter J. Plumb, III of Fox, Edwards & Plumb, Salt Lake City, for defendant and respondent.

STEWART, Justice:

Plaintiff brought actions against each of the defendants, nine dairy farmers, for collection of promissory notes which defendants executed in favor of their dairy cooperative, Dairymen Associates, Inc. (herein "Dairymen"), for assignment from plaintiff to Dairymen. Each defendant alleged as a defense that plaintiff had fraudulently induced him to execute the note.[1] The nine cases were consolidated for trial before the District Court for Salt Lake County, sitting with a jury. From judgments entered on the jury verdicts in favor of each defendant, and the Court's denial of plaintiff's motions for directed verdicts and judgments notwithstanding the verdicts, plaintiff appeals. The principal issue on this appeal is whether as a matter of law defendants can avoid the obligations of the promissory notes, which they concededly signed, on the ground that the signing of the notes was fraudulently induced.

Each of the defendants is a director of Dairymen, and each contracted with Dairymen to deliver milk for marketing. During the period pertinent to this action, William H. Finney was the general manager of Dairymen. He was neither a producer of milk nor a director of the corporation. In January 1975 Finney negotiated with plaintiff for certain loans to Dairymen. These negotiations culminated in two loans by plaintiff to Dairymen: the first, a term loan in the amount of $380,000, and the second, a "seasonal" loan of amounts as needed during the season up to $180,000. The total amount of the term loan was disbursed to the cooperative, but only $126,000 of the seasonal loan was disbursed.

As security for these loans, plaintiff took mortgages on all the property of Dairymen, which consisted of four parcels of real property, all the dairy equipment and rolling stock, the trade name "Heber Valley Milk," and all accounts receivable. The plaintiff also requested promissory notes from the defendants.

1. Defendant Harvey W. Higley did not originally allege fraud as a defense but was allowed to amend his answer at the time of the trial to include this defense.

A great deal of evidence was produced at the trial concerning whether any of plaintiff's representatives made any representations to defendants in order to induce them to sign the individual promissory notes, and if so, whether the representations were made directly to defendants or to Finney with the intent that he convey these representations to defendants, and at what times these representations were made. Although the evidence was conflicting in many respects, there was substantial evidence upon which the jury could find all the elements of fraud. The evidence demonstrates that the defendants refused to sign individual notes prior to a meeting held at the Minoa Restaurant in Salt Lake City on February 4, 1975, at which most of the defendants and two representatives of plaintiff were present, and that defendants signed the notes on or about March 26, 1975, at or after a second meeting held in Tremonton, Utah, and attended by Finney and most of the defendants. Defendants contend that they were induced to sign the notes in reliance on the misrepresentations made to them at these meetings. Plaintiff contends that defendants had no right to rely on any representations made which were inconsistent with the terms of the notes.

Under date of March 26, 1975, defendant Russell Wayment, president of the cooperative, executed a loan agreement for a seasonal loan of $180,000, a loan agreement for a term loan of $380,000, a promissory note in favor of plaintiff in the principal amount of $180,000, a promissory note in favor of plaintiff in the principal amount of $380,000, a security agreement, and a realty mortgage. Also, under date of March 26, 1975, each of the defendants, except Harvey Higley, executed an installment promissory note. Sometime subsequent to March 26, 1975, defendant Russell Wayment, as president of the cooperative, assigned those notes to plaintiff. Under date of July 26, 1975, defendant Harvey Higley executed an installment promissory note. That note also was subsequently assigned to plaintiff.

The amount of the notes signed by the farmers was apportioned among them according to the amount of their "milk base," or license to deliver milk to Dairymen for marketing. Each of the notes, signed by defendants and sued upon here, contains the following language:

> This note is made and delivered to the payee, Dairymen Associates, Inc., for the sole and limited purpose of collateralizing and guaranteeing a term loan up to the face amount hereof, (amount of individual note), evidenced by that certain promissory note, bearing even date herewith, from Dairymen Associates, Inc., to the Berkeley Bank for Cooperatives as payee, in the sum of Three Hundred Eighty Thousand Dollars ($380,000) . . . . .

Following the signature of the defendant, each note contains this language:

> ENDORSEMENT:
>
> This note, as additional collateral and guarantee of the payment of that certain collaterized promissory note from Dairymen Associates, Inc., as maker, and Berkeley Bank for Cooperatives as payee, is endorsed to the Berkeley Bank for Cooperatives, said note being in the face amount of $380,000, and bearing even date herewith.

Dairymen defaulted on its notes to plaintiff and filed a voluntary petition in bankruptcy in December 1975. The evidence in this case shows that plaintiff realized $185,000 from the sale of the assets of Dairymen at the sheriff's sales following the bankruptcy and was pursuing collection of one of Dairymen's accounts receivable in the amount of $30,000 at the time of the trial. Plaintiff brought action against these nine defendants on the individual promissory notes—the only remaining collateral available to satisfy plaintiff's claims against Dairymen.

The representations which defendants contend in their defense were fraudulent are:

1. That as a standard procedure the plaintiff required personal promissory notes from the members of all of the cooperatives to which it made loans.

2. That the notes were not "money notes," but would be used to guarantee that the defendants would continue to ship milk to Dairymen so that Dairymen would stay in business and be able to repay the large loans.

3. That plaintiff would never collect on these notes.

The case was submitted to the jury on special interrogatories, and the jury found each of the nine elements of fraud [2] against plaintiff and in favor of each of the nine defendants.

We are obliged on appeal to view the evidence in the light most supportive of the findings of the trier of fact, *Rodgers v. Hansen*, Utah, 580 P.2d 233 (1978). The issue of actual reliance and the reasonableness of the reliance is, of course, for the jury to determine, *Stuck v. Delta Land & Water Co.*, 63 Utah 495, 227 P. 791 (1924); *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co.*, 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920 (1941); 37 C.J.S. Fraud § 129. It is also for the jury to determine whether the representations were of such a character and made under such circumstances that they were likely to deceive, *Lewis v. White*, 2 Utah 2d 101, 269 P.2d 865 (1954).

Plaintiff contends that the evidence of fraud was not sufficient as a matter of law to present the question of fraud to the jury, because it did not rise to the standard of being clear and convincing,[3] and that the district court erred in denying plaintiff's motions (1) for directed verdicts at the conclusion of defendants' evidence and (2) for judgments notwithstanding the verdicts, or in the alternative for a new trial.

The record in the present case is replete with evidence that a number of representations were made by plaintiff, or by plaintiff through Finney, to the defendants for the purpose of inducing them to sign the promissory notes in favor of their cooperative, Dairymen Associates, Inc. The jury heard testimony from all of the defendants supporting their contentions that they were induced to sign the promissory notes only by plaintiff's representations and assurances as to the "real" nature of the notes.

The dissent implies that the record does not support a finding that the plaintiff bank represented to defendants that it would not collect on the notes. The fact is there is ample evidence in the record from which a jury could find that representation to have indeed been made. Several of the individual defendants testified that they were in no position to assume additional financial obligations because they were already in debt up to their limits. Those who questioned the financial condition of the co-op were assured that its situation had improved and there was sufficient collateral to carry the mortgage. Each testified that he had been told the purpose of the notes was to keep the members tied to the co-op and that the notes were "just a formality." The notes, it was explained, just represented a "shipping right" evidencing the member's commitment to the co-op. The defendants stated they would have continued to refuse to sign the notes if they had not been repeatedly assured that the notes were required as a standard procedure of all co-ops getting loans from plaintiff, that they were solely for the purpose of assuring Dairymen with a source of milk, and that they would not be collected.

Plaintiff's vice-president, Robert Rathbone, testified that he possibly had made representations to the farmers that the notes were not "money notes" and would be

---

2. See *Pace v. Parrish*, 122 Utah 141, 145, 247 P.2d 273, 274–75 (1952), in which this Court set forth nine essential elements of fraud:

   (1) that a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

3. *Pace v. Parrish, supra; Greenwell v. Duvall*, 9 Utah 2d 89, 338 P.2d 118 (1959); *Beehive Security Co. v. Bush*, 16 Utah 2d 328, 400 P.2d 506 (1965).

used only to guarantee a delivery of milk by the farmers to the co-op which borrowed the money. He also indicated that the bank nevertheless considered the notes to be subject to collection by the bank. Rathbone stated that his communications to the cooperative members were primarily through Finney, the general manager, and that he intended his statements to Finney to be communicated to the producer-members. Rathbone also stated that he attended the Minoa meeting where the purpose of the notes was explained and did not correct any statements made by Finney there. When asked whether he had ever told the defendants that the notes were to be used to commit the individual producers to stay with the co-op and ship and sell their milk to the cooperative, he answered, "I believe that in that general context that statement was probably made by me." It is also clear from Rathbone's testimony that the Bank made no inquiry into the assets, liabilities, or ability to pay of the individual defendants, nor did the individual member notes contain the usual acceleration clause in the case of default.

When the case was submitted to the jury, the jury answered affirmatively each of the special interrogatories propounded to them as to the elements of fraud, basing their answers on what was required to be "clear and convincing evidence" in the case. In essence the jury made the following findings as to each defendant: Prior to the time that the installment promissory notes dated March 26, 1975, were executed by each of the defendants, agents or representatives of Berkeley Bank for Cooperatives made representations to the signer, directly or through Dairymen Associates, Inc., or its general manager, concerning a then existing material fact; the representations were false, and were known to be false or were made recklessly, based upon insufficient knowledge; such representations were made for the purpose of inducing the defendants to act upon them; the defendants acted reasonably and in ignorance of the falsity of such representations, in relying in fact upon them; that the defendants were entitled to rely on such representations;

and that they were induced to sign the promissory notes as a result of their reliance on such representations.

In the present case the representations were made to farmers who, though acting as directors of their cooperative, hired a business manager to deal with the financial complexities of their operation. Yet they were not naive; they questioned the purpose of the promissory notes, and the objections and concerns of each were met by plaintiff's assurances *that the sole purpose of the notes was to guarantee producer participation in the future operations of the cooperative so as to assure its success.* It is undisputed that the cooperative did own substantial assets that provided collateral for the loan being negotiated. Under the circumstances of this case, it was clearly, as the trial court properly ruled, within the province of the jury to determine whether the defendants' reliance on the repeated assertions of plaintiff was justified. In the face of the admission by its own vice-president, plaintiff's contention that "even if the representation were false when made, it is not a representation on which defendants had a right to rely" is without substance. It is clear that the defendant farmers objected to signing notes imposing additional financial obligations on them, but that they finally did so only because of assurances made by the plaintiff that the notes were required merely to obligate them to sell their milk to the co-op. Furthermore, it was not the farmers who received the proceeds of the loan; it was the co-op, and the loan was made on the strength of the co-op's assets. Upon default the bank, not being made whole on its loan, turned against the farmers for the deficit despite its earlier representations.

A jury found that the reliance by the farmers in this case on the statements of bank representatives was reasonable, as well as finding all the other elements of fraud, under instructions that the evidence had to be clear and convincing as to each finding. The jury's finding of reasonable reliance was based on a full knowledge of all the facts and circumstances of the ad-

mitted misrepresentations. Moreover, the trial judge who was also aware of all the facts and circumstances refused to rule as a matter of law that reliance was unjustifiable.

*Schupp v. Davey Tree Expert Co.*, 235 Mich. 268, 209 N.W. 85 (1926), is closely in point. In *Schupp*, plaintiff was asked to sign a written contract which obligated him to pay a certain amount of money for work that had already been performed pursuant to an oral agreement. The written contract did not embody the terms of the oral agreement previously made between the parties; it was signed simply as a personal accommodation to a workman, who represented that it was needed for the home office but that it would have no legal effect. Suit was later brought on the contract, and Schupp sought to defend on the ground that the so-called contract was not intended as a contract at all, even though it clearly purported to be one. No effort was made to vary the terms of the writing. The Michigan Supreme Court held:

> In case of fraud in procuring signature to a writing, defense against liability may be made at law, or the power of the court of equity to cancel the writing may be invoked. *Austin v. Ash*, 232 Mich. 251, 205 N.W. 155.
>
> We have given due consideration to the business experience and supposed acumen of plaintiff and his confessed simplicity in sending out the paper over his signature to accomplish a purpose directly opposed to its terms, but feel that his guilelessness on this occasion should not cause us to overlook the guile employed by defendant's representative. The fraud worked because plaintiff was careless, but this did not render it any less a fraud. [*Id.* at 209 N.W. 86.]

This Court has dealt similarly with contractual agreements induced by deception. The enforceability of a contract containing a provision that one party assured the other would not be enforced was at issue in *Swanson v. Sims*, 51 Utah 485, 170 P. 774 (1918). The defendant in that case contracted with plaintiff for the sale of theater company stock. Although their oral agreement embodied no prohibition against defendant's connection with moving picture shows in Salt Lake City during the next five years, the written contract submitted to defendant did contain such a provision. The defendant alleged that he refused to sign the contract unless the prohibition was deleted; thereupon the plaintiff requested that the defendant sign, and the plaintiff agreed and stated that the defendant would not be bound by the disputed provision and that the plaintiff would furnish defendant with a writing to that effect. Defendant stated that only because of his reliance on that statement did he sign the contract. Subsequently defendant did become involved in the theater business, and plaintiff sought an order restraining the defendant from in any way violating the provisions of the contract. Rejecting jury findings in favor of defendant, the court entered judgment for plaintiff, and defendant appealed.

This Court reversed the lower court's ruling, and stated, 51 Utah at 494–95, 170 P. at 776–77:

> That . . . the existence of such facts [as proven here] will defeat a recovery upon a written contract, is, we think, clearly established by the authorities. Not in any way tending to vary or contradict the terms of a written contract, but to prevent the enforcement of a contract that never, as a matter of fact, existed, and to prevent, as alleged in the counterclaim, and as found by the jury, the enforcement of a contract the signature to which was procured by fraud and deceit. [Citations omitted.]
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [I]t would be inequitable and unjust to specifically enforce this contract as against defendant for the reason that it affirmatively appears that the contract was executed upon verbal promises and assurances that that provision would not be enforced and was not to be binding on defendant.

In denying plaintiff's petition for rehearing in the matter, the Court referred to the

. . . elementary proposition that fraud vitiated all contracts when established, and that any one induced to make a contract by false representations could be relieved from the burden thereof by a court of equity. Such in short is the holding of this court in its opinion in this case. That principle of law has been usually recognized by all courts and textwriters, and we do not feel disposed to depart from a rule founded, as it is, upon ordinary common honesty. [51 Utah at 499–500, 170 P. at 778.]

See also *Schipfer v. Stone*, 206 Iowa 328, 218 N.W. 568 (1928); *Bob v. Holmes*, 78 Mich.App. 205, 259 N.W.2d 427 (1977).

■ This Court, in *Johnson v. Allen*, 108 Utah 148, 158 P.2d 134 (1945), laid down the rule "that a person will be given relief from fraud even though he failed to read the contract before signing if he was by some act or artifice induced to refrain from reading it, or if because of the circumstances he was justified in relying on the representations made" (158 P.2d at 137). In *Johnson* the dispute concerned the contents of promissory notes as such. This rule applies with equal force in the instant case where the artifice which was used to induce the signing went, in effect, to the nature of the documents signed rather than to the actual contents of the documents.

Can anybody reasonably contend, if a person asks for a check for a certain sum of money from another and obtains it on an express promise to hold the check for a certain number of days before cashing it, that fraud is not committed if at the time of the representation the payee's intention was to cash it immediately? Would not the same be the case with respect to a purchase order calling for the delivery of goods on a specific date if the seller promises to ship on another date but deceives the purchaser by his ulterior intention to stand by the date of the purchase order? Such instances are common in the commercial affairs of people, and to decide otherwise than the jury did in the present matter would reward cunning at the expense of the person upon whom a fraud is committed.

■ In support of its contention that reliance by the defendants in this case was not reasonable, plaintiff cites *Jardine v. Brunswick Corp.*, 18 Utah 2d 378, 423 P.2d 659 (1967), for the proposition that a person must exercise the care of an ordinary, reasonable, and prudent person to protect his own interests and that if he fails to do so, he is precluded from holding someone else to account for the consequences of his own neglect. *Jardine*, however, is not on point. It was a case of *negligent* misrepresentation. Negligence is a proper defense in a case of negligent misrepresentation, but it is not a proper defense in the case of an intentional misrepresentation. Dean Prosser, in *Law of Torts*, § 108 at 716 (4th ed. 1971), states that the general rule is that "mere negligence . . . is not a defense to an intentional tort. The better reasoned cases have rejected contributory negligence as a defense applicable to intentional deceit, taking account of the effect which the representation was intended to have upon the plaintiff's [here, defendants'] mind."

■ Plaintiff also grounds its appeal on the principle that fraud cannot be predicated upon representations or statements of an intention to perform or not perform an act in the future. However, what is involved in this case is whether the *fact* of *the then present intent* of the bank at the time of its representations to the farmers was contrary to the statements made to the farmers. Under such circumstances, the misrepresentations are actionable. As stated in Harper and James, *The Law of Torts*, Vol. 1, 571–72 (1956):

A closely similar problem is raised by a promise or statement of future conduct by one who, at the time, intends not to fulfill the promise. The promise itself is regarded as a representation of a present intention to perform. Hence, such a promise, made by one not intending to perform operates as a misrepresentation—a misrepresentation of the speaker's state of mind, at the time, and is actionable as a misrepresentation of "fact." "To profess an intent to do or

not to do, when the party intends the contrary, is as clear a case of misrepresentation and fraud as could be made." [Citations omitted.]

■ This Court in *Papanikolas v. Sampson*, 73 Utah 404, 274 P. 856 (1929), stated, in accord with general principles, that a statement of future intention is actionable if a fraudulent intention existed at the time the deceitful statement was made. See also *Hull v. Flinders*, 83 Utah 158, 27 P.2d 56 (1933); compare *State v. Bruce*, 1 Utah 2d 136, 262 P.2d 960 (1953). In the instant case the jury found the necessary fraudulent intent at the time that representations as to future conduct were made by the defendant.

■ Moreover, we recognize the proposition that statements of opinions as to the legal effect of contracts are not generally a proper basis for a claim of fraud. *Ackerman v. Bramwell Investment Co.*, 80 Utah 52, 12 P.2d 623 (1932). The statements in this case, however, were not opinions as to matters of law; they were statements of fact as to the bank's then-present intention that it would not look to the farmers to repay the loan made to the co-op. See *Schupp v. Davey Tree Expert Co.*, supra, and *Swanson v. Sims*, supra.

■ It can hardly be maintained that the general moral level of business and other financial relationships would be enhanced by a rule of law which would allow a person to defend against a willful, deliberate fraud by stating, "You should not have trusted or believed me" or "Had you not been so gullible you would not have been [so] deceived." *Johnson v. Allen*, 108 Utah at 153, 158 P.2d at 137; see also *Pace v. Parrish*, 122 Utah at 149, 247 P.2d at 276. The rules governing fraud should foster intercourse based on trust, forthrightness, and honesty.

As this Court stated in *Campbell v. Safeway Stores, Inc.*, 15 Utah 2d 113, 117, 388 P.2d 409, 412 (1964), "When the parties have had a full and fair opportunity to present their ·cause, and the jury has rendered its verdict, it should not be interfered with unless there appears some compelling reason why justice demands that it be done." There is no compelling reason here; indeed, there is no reason at all.

The judgment is affirmed. Costs to Defendants.

CROCKETT, C. J., and MAUGHAN and HALL, JJ., concur.

WILKINS, Justice (dissenting):

I respectfully dissent.

While I am aware of the great reluctance of the Court to overturn a jury verdict,[1] still, I am of the opinion that there was no jury question presented here, and the District Court erred in denying plaintiff's motion for a directed verdict and its motion for judgment notwithstanding the verdict. There is, here, insufficient evidence of fraud on the part of plaintiff to present that issue to the jury. In addition, defendants were not, as a matter of law, entitled to rely on the representations made by the Bank's agents as construed by them.

The majority opinion emphasizes defendants' testimony that they would never have signed the notes had they thought the bank would collect upon them. The majority opinion states that the loan was made upon the strength of the "co-op's" assets, ignoring the fact that the evidence shows without contradiction the Bank's refusal to make the loan secured only by the "co-op's" assets without defendants' personal guarantee by way of these notes. The majority opinion, by way of justification of its action today, points out that the defendants did not receive the funds; that their cooperative did. But it is in the nature of a guarantee of a loan that the guarantor does not receive the proceeds.[2] And it has never, to

---

1. The Court will, however, overturn a jury verdict where that verdict is the product of a biased and prejudiced jury. See *Kilpack v. Wignall*, Utah, 604 P.2d 462 (1979).

2. See generally, *General Appliance Corp. v. Haw, Inc.*, 30 Utah 2d 238, 516 P.2d 346 (1973); *Packaging Corp. of America v. Morris*, Utah, 561 P.2d 680 (1977); *Cessna Finance Corp. v. Meyer*, Utah, 575 P.2d 1048 (1978).

my knowledge, until this day, been a defense to a guarantor's liability, that when he signed the guarantee, the said guarantor did not think his debtor would default or that he did not think the assured party would seek to enforce the guarantee.

But here, defendants aver that they were assured that their guarantee was merely a guarantee that they would continue to deliver milk to the cooperative; that the notes were meant to assure the bank of the farmers' continued participation in the cooperative. To be sure, Rathbone, plaintiff's vice president, testified that he had, in a general way, stated that the notes were for the purpose of guaranteeing that the farmers would continue to deliver milk to Dairymen. Finney, defendants' agent, testified that it was his understanding that the notes would be used to keep a farmer delivering milk to Dairymen, which would be accomplished by threatening collection of the promissory note should the farmer sell his milk elsewhere.

How, then, does this representation constitute fraud? If defendants did not agree to guarantee the loan made to Dairymen, but instead agreed to sign the notes as guarantees that they would continue to deliver their milk through Dairymen, then defendants are in default on their contracts, and the notes are due and payable, because defendants are no longer delivering milk to Dairymen. And they agreed to discontinue delivering the milk when they voted at their directors' meeting to declare Dairymen bankrupt. Plaintiff's representatives attempted to attend this meeting to present an alternate solution for Dairymen's financial difficulties, but they were excluded by defendants.

It also must be noted that if by this representation, the Bank promised not to collect the notes as long as defendants were delivering milk to Dairymen, then that promise has been fulfilled by the Bank. For the Bank did not pursue the collection of these notes until after defendants ceased delivering milk. The evidence also shows that the Bank duly exhausted all collateral securing its loan to Dairymen before it brought action against defendants, as guarantors, for the deficiency.

Defendants do not contend that they did not know that the documents they signed were promissory notes, nor do they contend that the signatures thereon are forgeries or were obtained by trick or device. Their contention is that though they knew they were signing promissory notes, and knew the legal effect of a note, they were led to believe that these notes had no legal efficacy. In *Ackerman v. Bramwell Inv. Co.*, 80 Utah 52, 12 P.2d 623 (1932), this Court held:

> The general rule is that misrepresentations of law or of the legal effect of contracts and writings does not constitute remedial fraud . . .
>
> \*　\*　\*　\*　\*　\*
>
> It is apparent that what the plaintiff chiefly relied on was the alleged and found representation as to the character and legal effect of the writing given her by the company simultaneously with the purchase and transfer of the note; but, as shown by the authorities, and for the reasons stated by them, the plaintiff in law was not permitted to rely on such representations or opinions, and hence may not be permitted to say she was misled by them. [12 P.2d at 626, 627.]

But instead of relying on *Ackerman*, the majority opinion cites the case of *Johnson v. Allen*, 108 Utah 148, 158 P.2d 134 (1945) for a proposition foreign to the holding of this Court in that case. There, defendant, in an effort to avoid the effect of the contract which he had signed, sought to defend on the ground that the plaintiff had misrepresented the terms of the written contract. He did not allege, or prove, that plaintiff had used trick or device to prevent his reading of the contract. In affirming the District Court's ruling that there was insufficient evidence of fraud to present the question to the jury, this Court said:

> It is on the grounds of unjustifiable reliance that courts deny relief to those who, relying on representations as to contents, sign written contracts without reading them. As a general proposition courts have adhered to the theory that

one sui juris in possession of all his faculties and dealing at arms length is not permitted by the law to rely exclusively upon the representations of the other contracting party as to the contents of a written contract. Courts look for something said or done which would be reasonably calculated to disarm a reasonably prudent person so that he would sign the contract without reading it and in the absence of some act or artifice in inducing the other party to refrain from reading the contract relief from the fraud is often denied. [158 P.2d at 137]

The facts that defendants do not deny that they knew they were signing notes, and also do not deny that plaintiff did nothing to prevent them from reading the note they were signing, are central to this case. But the majority opinion, I submit, ignores these facts, and applies a rule found in a case which deals solely with the issue of fraud in inducing the signing of a contract by trick or device. This Court, in *Johnson*, also said:

> Still when parties undertake to reduce their oral negotiations to writing both must understand that the writing is to express the contract. If one in defense to an action on the contract were to be permitted to say that the other falsely represented that something had been included or excluded therefrom, the writing would be of little value. Every case could present a jury question as to whether the writing correctly expressed the agreement. In *Kelley v. Salt Lake Transportation Co.*, supra [100 Utah 436, 116 P.2d 383, 385], we quoted with approval from *Pennsylvania R. Co. v. Shay*, 82 Pa. 198, in which it was stated:
>
> > "It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise and indubitable; otherwise it should be withdrawn from the jury." [158 P.2d at 137–138.]

It is not sound law to hold these guarantor notes void on the ground that the guarantors believed they were not "money notes," particularly when the guarantors were, as the majority opinion observes, not unsophisticated.

I have dealt, in this dissent, with the allegation of fraud numbered 2 in the majority opinion because I believe that issue to be critical to this case. However, it is also my opinion that the other representations, numbered 1 and 3 in the majority opinion, do not constitute actionable fraud, as they imply misrepresentations by plaintiff of the value and financial condition of defendants' own corporation (Dairymen) to those defendants. Each defendant was a director of Dairymen at the times pertinent here, and as such, had equal, if not better means than an outsider to the organization would have, of knowing the value of the assets and the financial condition of Dairymen.[3] Where the allegedly defrauded party has an equal means of ascertaining the facts, that party will not be heard to say that he relied on misrepresentations of those facts.[4]

I would reverse this case and remand it to the District Court for entry of judgment in favor of plaintiff in each case in the amount due and unpaid of the respective notes.

---

3. *Gay v. Mercantile Inst.*, 37 Utah 280, 107 P. 237 (1910).

4. See 37 Am.Jur., Fraud and Deceit, § 237, and the cases cited therein.